[No. 76785-8. En Banc.]
Argued January 24, 2006. Decided May 11, 2006.

THE STATE OF WASHINGTON, *Respondent*, v. RICHARD LEON
HOSIER, *Petitioner*.

*Eric Broman* (of *Nielsen, Broman & Koch, P.L.L.C.*), for petitioner.

4

*Janice E. Ellis, Prosecuting Attorney*, and *Thomas M. Curtis* and *Seth A. Fine, Deputies*, for respondent.

¶1 MADSEN, J. — Petitioner Richard Leon Hosier challenges the Court of Appeals decision in this case affirming his conviction on two counts of communication with a minor for immoral purposes. He contends that there was insufficient evidence to support these convictions. Additionally, he claims that the Court of Appeals' "foreseeability analysis" rewrites former RCW 9.68A.090 (1989), unconstitutionally adding an element not included by the legislature and chilling possession of protected materials. We affirm the Court of Appeals.

## FACTS

¶2 On May 2, 2002, at approximately 8:15 AM, Shari Engberg, an employee of Kids 'N Us Child Care & Learning Center located in Marysville, Washington, saw a pair of hot pink, young girl's underpants placed in a chain link fence in the children's playground area. Findings of Fact (FOF) 3, 9, count 2.[1] The underpants were a girl's size seven. FOF 9, count 2. Written on the front, crotch, and back of the underpants with a dark marker was a message fantasizing about sexual contact with a 7-year-old girl. FOF 10, count 2. The underpants were placed in the fence at the eye level of the children who commonly use the playground area. FOF 5, 6, count 2. Engberg saw the underpants while she was in the process of moving the day care center's vans. FOF 4, count 2. She testified that she noticed that the underpants had been written on with a black marker, but she did not approach or inspect the underpants. She thought it odd that

---

[1] These events are referred to as count 2 by the trial court.

the underpants were placed in the fence and thought that it might have been a teenage prank using clothing from a Goodwill store nearby. *Id.* She proceeded to move the vans around the building and to transport the older children to school and did not have a chance to mention the underpants to anyone at the day care center.

¶3 Later that morning, seven to eight children playing in the area found the little girl's underpants in the fence. FOF 7, count 2. The children poked the underpants through the fence with a stick, knocking them to the ground. FOF 8, count 2. The children reported their find to Jodie Kaullen, a teacher at the day care center, and led her to the fence. Kaullen put on latex gloves and picked up the underpants and read the message. She then brought them to her supervisor who called the police. FOF 14, count 2. The children who found the underpants were between the ages of 3 and 5 and could not read because of their ages. FOF 12, count 2.

¶4 On June 23, 2002, Michael Smith found two hand-written paper notes in his yard while mowing the lawn. FOF 9, count 1.[2] The two notes were close together on the grass, dry and in good condition near the family's vehicles. FOF 10, count 1. The notes referred to having sex with a young girl matching the age and description of Smith's daughter.

¶5 M.S., Smith's 13-year-old daughter, who frequently played in the front yard, had been playing in the front yard earlier that day. Shortly after finding the two notes, Smith told his daughter M.S. that he had found two sexually explicit notes in the front yard. FOF 11, count 1. He did not show or read the notes to her, but he told her that:

> I found some notes that were very sexual and they were seemingly threatening and that I didn't know who had written them, but to be extra careful and don't be alone on the street and that I was going to take the notes to the police.

---

[2] These events are referred to as count 1 by the trial court.

Verbatim Report of Proceeding (VRP) at 59 (Feb. 3-4, 2003).[3] He also told her that the notes "kind of described her." VRP at 59. He thought the contents of the notes might be about her due to the physical description in one of the notes. FOF 11, count 1. In telling her to be careful, he said to "especially stay away from the house across the street, I don't know if he [Hosier] wrote them or not, but be careful anyway." VRP at 64. In June 2002, Hosier, a 54-year-old adult male, lived directly across the street from the Smiths. FOF 1, count 1. Various windows in Hosier's house provide a direct view of M.S.'s front yard and her bedroom. FOF 3, count 1. Smith made copies of the notes, took the copies across the street, and confronted Hosier. FOF 11, count 1. Smith knew that Hosier was a level III sexual offender. Hosier denied authoring or leaving the notes. FOF 11, count 1. On June 24, 2002, Smith turned the notes over to the police. FOF 13, count 1.

¶6 On August 1, 2002, the police arrested Hosier. FOF 14, count 1. The police interviewed Hosier, who admitted that he wrote the notes and placed them on M.S.'s lawn. FOF 14, count 1.[4] During the interview, Hosier described M.S. as a girl that "lives across the street" and is "heavy set, probably 12, 13, maybe younger I don't know for sure." Ex. 61, at 5. While Hosier could describe M.S., he did not know her name. *Id.* He said that a few days before leaving the notes, he had observed M.S. in her bedroom undressing. FOF 3, count 1. At the time, Hosier said to a friend, "I can't watch this anymore or I will be in trouble in a second." FOF 4, count 1. Hosier told police that he constantly fought "the battle" against the urges he had to commit sexually related crimes. FOF 15, count 1. Hosier said that he had sexual fantasies about a girl with M.S.'s physical characteristics.

---

[3] Unless otherwise provided, VRP refers to the Verbatim Report of Proceedings from the February 3-4, 2003, bench trial.

[4] Hosier was questioned only about the notes placed in M.S.'s lawn. He was not questioned about the pair of little girl's underpants left at the day care center because the interviewer was not aware of that case at the time of the interview. FOF 15, count 2. At the trial, Hosier's attorney stipulated that Hosier wrote all of the notes, including the writing on the child's underpants.

FOF 16, count 1. Pursuant to a search warrant, the police searched Hosier's residence. Evidence collected included child pornography, pens, paper and writing samples, and children's underpants.

¶7 Following a bench trial, Hosier was convicted of two counts of communication with a minor for immoral purposes, one count of attempted communication with a minor for immoral purposes, and two counts of harassment. Hosier appealed, claiming that there was insufficient evidence to support all five of the convictions. He also challenged the trial court's denial of his motion to suppress evidence found during a search of his residence pursuant to a search warrant. In a unanimous published opinion, the Court of Appeals affirmed the trial court on all issues. *See State v. Hosier*, 124 Wn. App. 696, 103 P.3d 217 (2004). Hosier petitioned this court for review, challenging only his two convictions for communication with a minor for immoral purposes, counts 1 and 2.[5]

## ANALYSIS

¶8 Hosier contends that there is insufficient evidence to support his two convictions for communication with a minor for immoral purposes under former RCW 9.68A.090 (1989).[6]

---

[5] He does not challenge his other three convictions or the use of the evidence found pursuant to the search of his residence pursuant to a search warrant.

[6] Former RCW 9.68A.090 provided that:

A person who communicates with a minor for immoral purposes is guilty of a gross misdemeanor, unless that person has previously been convicted under this section or of a felony sexual offense under chapter 9.68A, 9A.44, or 9A.64 RCW or of any other felony sexual offense in this or any other state, in which case the person is guilty of a class C felony punishable under chapter 9A.20 RCW.

The statute has been amended by the legislature twice in 2003 and RCW 9.68A.090 currently provides:

(1) Except as provided in subsection (2) of this section, a person who communicates with a minor for immoral purposes, or a person who communicates with someone the person believes to be a minor for immoral purposes, is guilty of a gross misdemeanor.

(2) A person who communicates with a minor for immoral purposes is guilty of a class C felony punishable according to chapter 9A.20 RCW if the person has previously been convicted under this section or of a felony sexual offense under

■■ ¶9 When reviewing a challenge to the sufficiency of the evidence, the test is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Myles*, 127 Wn.2d 807, 816, 903 P.2d 979 (1995); *State v. Joy*, 121 Wn.2d 333, 338, 851 P.2d 654 (1993); *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). All reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. *Myles*, 127 Wn.2d at 816; *Joy*, 121 Wn.2d at 339 (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). Hosier has not challenged any of the trial courts factual findings and, therefore, the trial court's findings of fact are a verity on appeal. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994); *State v. Alvarez*, 105 Wn. App. 215, 220, 19 P.3d 485 (2001).

■■ ¶10 Hosier first asks this court to define the term "communicate" in former RCW 9.68A.090 to mean both "transmission" and "reception" of a message to a minor for immoral purposes. Hosier points to the various dictionary definitions that define "communicate" as " 'to make known : inform a person of,' " quoting *Webster's Third New International Dictionary* 460 (1993), and as "the expression or exchange of information by speech, writing, or gestures," citing *Black's Law Dictionary* 273 (defining "communication") (7th ed. 1999). Suppl. Br. of Pet'r at 8. On review, the State does not disagree with this definition. *See* Suppl. Br. of Resp't at 8 ("The State does not take issue with the proposition that a communication requires both transmission and receipt."). Hosier claims if "communicate" is defined to only mean "transmission" of an inappropriate message to a minor, rather than transmission and receipt, a person could be found guilty of the crime when only an

chapter 9.68A, 9A.44, or 9A.64 RCW or of any other felony sexual offense in this or any other state.

*See* LAWS OF 2003, chs. 26, 53, §§ 1, 42.

"attempt" to communicate with a child was undertaken. We agree.

¶11 As this court has made clear, RCW 9.68A.090 is designed to prohibit "communication *with children* for the predatory purpose of promoting their exposure to and involvement in sexual misconduct." *State v. McNallie*, 120 Wn.2d 925, 933, 846 P.2d 1358 (1993) (emphasis added). Unless a person's message is both transmitted by the person and received by the minor, the person has not communicated "with children," the act the statute is designed to prohibit and punish. Requiring both transmittal and receipt is consistent with our prior case law and supported by common sense.

¶12 Applying the definition discussed above, Hosier contends that the Court of Appeals erred in affirming his conviction in count 1 because he only transmitted his message. He claims that there was insufficient evidence supporting the court's finding that M.S. received his message. Hosier claims that M.S. did not receive the message because M.S. did not "read or even see" the two notes he left for her in her front yard. At worst, Hosier claims he only *attempted* to communicate with M.S.

¶13 The State claims that Hosier is asking this court to add an element, the exposure of the victim to the exact wording of the obscene notes, to the crime of communicating with a minor for immoral purposes. Requiring that the victim receive the precise message transmitted by the defendant, the State contends, would frustrate the clear intent of the legislature. RCW 9.68A.001 provides that "[t]he care of children is a sacred trust and should not be abused by those who seek commercial gain or *personal gratification* based on the exploitation of children." (Emphasis added.) *See* Suppl. Br. of Resp't at 4.[7] The State argues that neither commercial gain nor personal gratification of the offender requires the minor

---

[7] RCW 9.68A.001, entitled "**Legislative finding**," with regard to chapter 9.68A RCW, "Sexual Exploitation of Children," provides in full:

The legislature finds that the prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance. The care

to be exposed to the specific language of the communication. Rather the statute is aimed at protecting children from exposure to sexual misconduct for the gratification of another. Requiring that a child receives the complete message, according to the State, frustrates this aim. Thus, the State contends, Smith's communication to his daughter, M.S., of the sexual nature of the notes satisfies the communication element in count 1.

¶14 We agree. Although M.S. did not read the notes, the trial court correctly found that Smith, her father, was a conduit for Hosier's communication with M.S. Smith testified that he told M.S. that he found two sexually threatening notes in the front yard that described M.S. Thus, M.S. knew that someone had been watching her in order to describe her, had written threatening notes of a sexual nature about her, and had physically placed the notes on her front yard where she regularly played. As the Court of Appeals noted, although Smith did not read the notes verbatim to M.S. (or give her the notes), "it is clear that he conveyed the sexual and threatening nature of the content of the notes to her in an effort to caution and protect her." *Hosier*, 124 Wn. App. at 705, ¶ 16.

¶15 Hosier contends, though, that there was no transmission of his sexual message to M.S. because, as the Court of Appeals observed, Smith's message served to caution M.S. Hosier claims that the State did not prove he conveyed the "distasteful content" of the notes and instead, he only conveyed a message to his daughter to be "extra careful and don't be alone on the street." Suppl. Br. of Pet'r at 15. However, this argument ignores the rest of the message, as well as his conduct, that was communicated to M.S. M.S.

of children is a sacred trust and should not be abused by those who seek commercial gain or personal gratification based on the exploitation of children.

The legislature further finds that the protection of children from sexual exploitation can be accomplished without infringing on a constitutionally protected activity. The definition of "sexually explicit conduct" and other operative definitions demarcate a line between protected and prohibited conduct and should not inhibit legitimate scientific, medical, or educational activities.

knew that the notes "described her," she knew that the notes were threatening and of a sexual nature about her, she knew that the author had placed the two notes in her front yard where she commonly plays, and she knew that the author might be the man who lives across the street.

¶16 Hosier next claims that to the extent there was any communication between Hosier and M.S., it was not prohibited by the statute. He cites *McNallie*, 120 Wn.2d at 933, claiming that the statute is instead targeted against communication which "grooms children into becoming *less careful* around adults," with the predatory purpose of promoting their exposure to and involvement in sexual misconduct. Suppl. Br. of Pet'r at 16-17. He says that Smith's editorial changes to the notes completely changed their content to encourage his daughter to be *more careful.* Thus, Hosier concludes, at worst, the State showed a substantial step taken by Hosier to communicate with M.S., successfully blocked by Smith.

¶17 This argument overlooks the legislative findings contained in RCW 9.68A.001, which reflect legislative concern with adults who exploit children for personal gratification. Here, based on Hosier's own statements, Hosier "communicated" with M.S. because it sexually excited him to do so. Hosier's communication with M.S. is exactly the sort of conduct the legislature intended to prohibit.

¶18 Courts have construed "communicate" in former RCW 9.68A.090 to include "conduct as well as words." *State v. Pietrzak*, 100 Wn. App. 291, 294-95, 997 P.2d 947 (2000); *State v. Falco*, 59 Wn. App. 354, 358, 796 P.2d 796 (1990) ("communicate" includes conduct as well as words) (citing *State v. Schimmelpfennig*, 92 Wn.2d 95, 103-04, 594 P.2d 442 (1979) (interpreting predecessor statute)). Courts have also defined "immoral purpose" as used in the statute as referring to "sexual misconduct." *Pietrzak,* 100 Wn. App. at 295 (citing *Falco*, 59 Wn. App. at 358 (citing *Schimmelpfennig*, 92 Wn.2d at 103-04)).

¶19 Hosier does not dispute that he wrote the notes with the requisite "predatory purpose" of promoting a minor's

exposure and involvement in "sexual misconduct" as required by *McNallie,* 120 Wn.2d at 933. *See also Schimmelpfennig,* 92 Wn.2d at 101, 103-04. Nor does he dispute that he left the notes in a location that M.S. was likely to find them. Hosier's message to M.S. expressing his desire to expose and involve M.S. in sexual misconduct, which included both "words and conduct," was sufficiently communicated to M.S. to satisfy the communication element of former RCW 9.68A.090. *Pietrzak,* 100 Wn. App. at 294-95.

¶20 Turning to count 2, Hosier argues that there was insufficient evidence to support his conviction because the minors who received the communication, the message written on child's underpants, could not read the message. Hosier contends that his actions are no more criminal than leaving a message in Klingon (a language spoken on *Star Trek*) or Kanji (a Japanese language). He claims that his actions were, at worst, an attempt to communicate with a minor. Suppl. Br. of Pet'r at 13.

¶21 The State responds that although the children may not have understood the communication, the communication was nevertheless received by the children. First, the State points out that Hosier's argument that the victim must understand the communication in order to meet the "communication" element conflicts with his argument concerning count 1. In count 1, Hosier claimed that since the victim was not exposed to the explicit language in the notes, the victim did not receive the communication. In count 2, though, the State says there was no issue of whether the children were exposed to the explicit sexual language on the underpants. Under Hosier's theory in count 1, the communication would have been completed. Instead, Hosier adds an additional requirement: "that the children be able to understand what he wrote." Suppl. Br. of Resp't at 6. The State claims that the message on the underpants left at the day care was clearly a communication made for the "personal gratification" of the sender and the minors were exposed to that communication.

¶22 As the Court of Appeals correctly points out, Hosier cites no authority suggesting that a victim must understand the sexual nature of a communication. The court declined to interpret RCW 9.68A.090 as requiring that a victim "must understand the prurient nature of a communication." *Hosier*, 124 Wn. App. at 707, ¶ 21. The court reasoned that to require the State to prove that a minor understands the explicitly prurient nature of a communication in order to meet the elements of the crime of communicating with a minor for immoral purposes would restrict the statute's application to victims sexually mature beyond their years, or omit from its reach the very victims it is intended to protect. *Id.* The court found no reasonable basis to presume that the legislature intended such an absurd result. The court held that the children's exposure to the underpants with its sexually explicit message was sufficient to support the finding that Hosier completed his communication with the children for an immoral purpose. *Id.*

¶23 We agree with the Court of Appeals that requiring children to fully understand a sexual message would thwart the legislature's intent in protecting children. It is also inconsistent with the results in two of this court's opinions. In *Schimmelpfennig*, a man stopped his van near a group of young girls. He engaged a four-year-old girl in conversation, attempting to lure her into his van and asking her in explicit terms to engage in various sexual acts with him. *Schimmelpfennig*, 92 Wn.2d at 97. The court affirmed the defendant's conviction of communicating with a minor for immoral purposes despite the fact that the young girl was only four years old and likely did not understand the nature of the man's requests. Similarly, in *McNallie*, 120 Wn.2d 925, a man discussed sexual acts with three young girls, ages 10 and 11, and exposed his penis. There, the court did not require proof that the girls understood the sexual language when affirming his conviction for communicating with a minor for immoral purposes.

¶24 Moreover, Hosier's message to the children at the day care was not simply a sexually explicit note. Rather,

his sexual message consisted both of words and also a symbolic message using little girl's underpants, bright pink in color to attract children. The conduct of placing attractive and sexual objects directed at children, combined with the sexual message, written in black marker and plainly visible, illustrates Hosier's overall intent: to convince a young girl to take off her underpants to engage in sexual misconduct.

¶25 Viewing the evidence in the light most favorable to the State, we hold that Hosier's message, both a written message and a symbolic message, was transmitted and received by the children. Accordingly, we hold that there was sufficient evidence to support Hosier's conviction for communicating with the minors at the day care for an immoral purpose.

¶26 Lastly, Hosier argues that the Court of Appeals "effectively rewrote" RCW 9.68A.090 when the court used a foreseeability analysis in its discussion of count 1, involving the two graphic notes that Hosier wrote and placed in M.S.'s front yard. Hosier asserts that under the Court of Appeals' opinion, it is now a crime for a person to "foreseeably communicate with a minor for immoral purposes." This new crime is unconstitutional, Hosier contends, because it will chill publication of legitimate and constitutionally protected materials intended for an adult audience, violating free speech protections. Without discussion or analysis, Hosier cites the following for support: *Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973); *Soundgarden v. Eikenberry*, 123 Wn.2d 750, 871 P.2d 1050, *cert. denied*, 513 U.S. 1056 (1994); *Sheehan v. Gregoire*, 272 F. Supp. 2d 1135 (W.D. Wash. 2003); Marjorie A. Caner, Annotation, *Musical Sound Recording as Punishable Obscenity*, 30 A.L.R.5th 718 (1995).

¶27 First, the cases and authority cited by Hosier do not discuss foreseeability. Second, and more importantly, Hosier takes two sentences of the Court of Appeals opinion and reads them out of context. As part of its analysis of count 1, the court said, "It was reasonably foreseeable that

Smith would find the notes. It is highly foreseeable that, based on the contents of the notes, Smith would communicate to M.S. that she was at risk of being sexually exploited and that she should act with caution." *Hosier*, 124 Wn. App. at 705, ¶ 16. By itself, taken out of context, this reasoning might be troubling. Foreseeability is not an element of the crime of communicating with a minor for immoral purposes. Rather, the State must prove that the defendant intended that the communication reach the child. However, consistent with *McNallie,* the Court of Appeals correctly recognized that a person must have " 'the predatory purpose of promoting [children's] exposure to and involvement in sexual misconduct' " in making the communication. *Hosier*, 124 Wn. App. at 704, ¶ 12 (quoting *McNallie,* 120 Wn.2d at 933). Thus, despite its brief discussion of foreseeability, the Court of Appeals properly held that the State had produced sufficient evidence to convince a rational trier of fact beyond a reasonable doubt that Hosier placed two sexually explicit notes in M.S.'s yard, a place where he had seen her play, with the intent to communicate with M.S., a minor, for an immoral purpose and that M.S. received the message.

¶28  We affirm the Court of Appeals.

ALEXANDER, C.J., and C. JOHNSON, BRIDGE, CHAMBERS, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.

¶29  SANDERS, J. (dissenting) — The majority concludes communication with a minor for immoral purposes requires neither actual receipt nor awareness of a message. I disagree. "Communication" means transmission of a message by one party and knowing receipt by another. So "communication with a minor" requires actual receipt of a message by a minor aware it is a message.

¶30  Richard Leon Hosier was convicted of two counts of communication with a minor for indecent purposes. First, Hosier left a note describing sexual acts he hoped to perform with a female child in front of a house where he

knew M.S., a 12-year-old girl, resided. The girl's father discovered the note, which the girl never saw. Second, Hosier wrote a message describing a female child performing sexual acts on a pair of panties, then hung the panties on the fence of a nursery school. Children discovered the panties and reported them to their teacher. The children could not read and nothing in the record indicates they realized the panties bore a message.

¶31 The majority concedes "communication" requires both transmission and receipt of a message. Majority at 8-9. But it concludes constructive receipt is sufficient. Thus, it finds a communication on the first count because the girl's father told her he found two sexually threatening notes describing her. Majority at 10. And it finds a communication on the second count simply because children found the panties. Majority at 13. In other words, the majority requires neither actual receipt of a message nor awareness a message exists.

¶32 The plain language of former RCW 9.68A.090 requires a minor to actually receive an improper communication. "A person who communicates *with a minor* for immoral purposes is guilty of a gross misdemeanor . . . ." Former RCW 9.68A.090 (1989) (emphasis added). Hosier *attempted* to communicate with M.S. but did not succeed. *See, e.g., In re C.W.*, 169 Vt. 512, 514, 739 A.2d 1236 (1999) (describing intercepted messages to minor as "attempted communications"); *In re Adoption of A.K.S.*, 713 N.E.2d 896, 899 (Ind. Ct. App. 1999) (describing letters intercepted by child's mother as "attempted communications"); *Commonwealth v. Cowan*, 9 Pa. D. & C.3d 582, 585 (1978) (describing request principal "turn over" student as "attempted communication" with child). Instead, he communicated with her father. M.S. learned of Hosier's note only through her father and knows nothing of its distasteful content.

¶33 The legislature intended chapter 9.68A RCW to protect children from sexual exploitation. RCW 9.68A.001. The majority incorrectly contends an actual receipt requirement "frustrates this aim" by "[r]equiring that a child

receives the complete message." Majority at 10. It does nothing of the sort. On the contrary, an actual receipt requirement merely reflects the difference between communication and attempted communication. We routinely punish inchoate offenses less severely. This is no exception.

¶34 By contrast, the majority's own odd construction of former RCW 9.68A.090 is entirely inconsistent with the purpose of chapter 9.68A RCW. By conditioning the existence of a communication on notification rather than actual receipt, the majority encourages a person who intercepts an improper message intended for a child to inform the child the message exists. An actual receipt requirement does not.

¶35 The plain language of former RCW 9.68A.090 also requires a minor realize a message exists. The majority correctly concludes a minor need not understand the meaning of an improper message. An intentional interaction with a minor constitutes a communication, whether or not the minor understands the improper content of the communication. *See State v. Schimmelpfennig*, 92 Wn.2d 95, 98, 594 P.2d 442 (1979). But no interaction exists if the minor does not realize a message exists. *See State v. Bohannon*, 62 Wn. App. 462, 472, 814 P.2d 694 (1991) (finding no communication if minor unaware of offending conduct); *State v. Falco*, 59 Wn. App. 354, 359, 796 P.2d 796 (1990) (finding no communication if minor unaware of offending message). Nothing in the record suggests the children who discovered the panties realized they conveyed a message, symbolic or otherwise. Accordingly, no communication existed.

¶36 I dissent.